UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-21700-BLOOM/Otazo-Reyes

MICHAEL FRIDMAN,

    Plaintiff,

v.

1-800 CONTACTS, INC.,

    Defendant.
_____/

**ORDER MOTION TO COMPEL ARBITRATION, STRIKE CLASS ALLEGATIONS, AND DISMISS OR, IN THE ALTERNATIVE, STAY PROCEEDINGS**

**THIS CAUSE** is before the Court upon Defendant 1-800 Contacts, Inc.'s Motion to Compel Arbitration, Strike Class Allegations, and Dismiss or, in the Alternative, Stay Proceedings, ECF No. [12] ("Motion"). Plaintiff Michael Fridman ("Fridman" or "Plaintiff") filed a Response, ECF No. [23], to which Defendant filed a Reply, ECF No. [24. The Court has carefully considered the Motion, the Response and Reply, including any relevant exhibits, the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, the Motion is denied.

**I.    BACKGROUND**

Plaintiff initiated this class action against Defendant on March 16, 2021, in the Eleventh Judicial Circuit Court in and form Miami-Dade County, Florida. *See* ECF No. [1-1]. On May 3, 2021, Defendant removed the above-styled case to this Court, alleging jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. Section 1332(d). ECF No. [1] ("Notice"). Plaintiff's Complaint asserts claims for violation of the Florida Security of Communications Act ("FSCA"), Florida Statutes, Sections 934.03 (Count 1), 934.04 (Count 2), and invasion of privacy (Count 3).

In the Complaint, Plaintiff alleges that Defendant utilizes the services of Quantum Metric, Inc. ("QM") to provide marketing analytics software for its website, 1800contacts.com ("Website"). QM's software provides a feature called "Session Replay" that allows a company to essentially reproduce any user's interaction with a website for the purpose of helping businesses improve their website design and customer experience. In the process of recording a user's interactions with a website, Session Replay collects sensitive user information such as passwords and credit card numbers, which leaves users vulnerable to data leaks. Plaintiff contends that QM's software, as used by Defendant, functions as a wiretap.

Plaintiff alleges further that QM's Replay Session feature recorded Plaintiff's keystrokes and mouse clicks on Defendant's Website when he visited it at the end of 2020 and placed an order for prescription contact lenses. According to Plaintiff, the QM wiretap captured other data, including the date, time, and duration of his visit, Plaintiff's IP address, location, browser type, and operating system. Plaintiff contends that QM's software additionally captures personally identifiable information and protected health information without seeking a user's consent.

In the Motion, Defendant seeks to compel arbitration of Plaintiff's claims individually based upon the Website's Terms of Service ("Terms"), which include an arbitration provision and a class-action waiver provision. In support of the Motion, Defendant has submitted the Declaration of Rico Lujan, ECF No. [12-1] ("Lujan Declaration"), which attaches two exhibits (Defendant's Terms and an Order Summary Page), and the Declaration of Brad Scott, ECF No. [12-2] ("Scott Declaration"). Plaintiff filed his Response, attaching the Declaration of Brian Levin, ECF No. [23-1] ("Levin Declaration"), which includes ten supporting exhibits (illustrating the account set-up and navigation process on Defendant's Website), the Declaration of Michael Fridman, ECF No. [23-2] ("Fridman Declaration"), the receipt for Plaintiff's December 25, 2020 purchase, ECF No.

[23-3], and a copy of the court's opinion in *Vitacost.com, Inc. v. McCants*, No. 4D16-3384 (published at 210 So. 3d 761 (Fla. 4th DCA 2017)). To its Reply, Defendant attaches additional printouts of screenshots from the website. *See* ECF No. [24-1].

## II.     LEGAL STANDARD

The presence of a valid arbitration provision raises a strong presumption in favor of enforcement. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 630-31 (1985) (stressing that the enforcement of a mutually agreed upon arbitration or forum-selection clause serves as an "indispensable precondition to the achievement of the orderliness and predictability essential to any international business transaction"). Indeed, the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, "embodies a 'liberal federal policy favoring arbitration agreements.'" *Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1366 (11th Cir. 2008) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Accordingly, the FAA requires courts to "rigorously enforce agreements to arbitrate." *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 312 F.3d 1349, 1357-58 (11th Cir. 2002) (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 625-26), *abrogated on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs*, 134 S. Ct. 773 (2014); *see also Hemispherx Biopharma, Inc.*, 553 F.3d at 1366 (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). Under the FAA, a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Despite courts' proclivity for enforcement, a party will not be required to arbitrate where it has not agreed to do so. *See Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F. Supp. 2d 1318, 1322 (S.D. Fla. 2010), *aff'd*, 433 F. App'x 842 (11th Cir. 2011) (citing *United Steelworkers of Am.*

*v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). "Under federal law, arbitration is a matter of consent, not coercion." *World Rentals & Sales, LLC v. Volvo Constr. Equip. Rents, Inc.*, 517 F.3d 1240, 1244 (11th Cir. 2008). It is axiomatic that the determination of whether parties have agreed to submit a dispute to arbitration is an issue of law subject to judicial resolution. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010). Generally, this determination requires the district court to apply standard principles of state contract law. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 939 (1995); *see also P&S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003).

In addition, the Court of Appeals for the Eleventh Circuit has explained that courts should "treat motions to compel arbitration similarly to motions for summary judgment." *Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1215 n.3 (11th Cir. 2021) (citing *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) (concluding "that a summary judgment-like standard is appropriate and hold[ing] that a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement")). Therefore, in determining whether to compel arbitration, district courts must view the facts in the light most favorable to the nonmovant. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

"By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc.*, 470 U.S. at 213. Thus, if the criteria above are satisfied, a court is required to issue an order compelling arbitration. *See John B. Goodman Ltd. P'ship v. THF Constr., Inc.*, 321 F.3d 1094, 1095 (11th Cir. 2003) ("Under the FAA, . . . a district court must grant a motion to compel arbitration if it is

4

satisfied that the parties actually agreed to arbitrate the dispute.").

## III. DISCUSSION

At the outset, the Court notes that the parties do not dispute the following facts. On January 24, 2019, Plaintiff opened an account with 1-800 Contacts and made a purchase for contact lenses on the Website. Scott Declaration, ECF No. [12-2] ¶¶ 8, 9. Plaintiff made a second purchase on the website on December 25, 2020. *Id.* ¶ 10. Various Website pages, including the homepage and the order summary page, include a direct hyperlink to the Terms. Lujan Declaration, ECF No. [12-1] ¶¶ 11, 13.

> The Terms state in pertinent part:
>
> Welcome to the 1-800 CONTACTS, Inc. ("1-800 CONTACTS") website. The following Terms of Service govern your use of this website ("Terms"). PLEASE READ THESE TERMS CAREFULLY AS THEY CONTAIN IMPORTANT INFORMATION THAT MAY AFFECT YOUR LEGAL RIGHTS, INCLUDING REQUIRING INDIVIDUAL ARBITRATION OF ANY POTENTIAL LEGAL DISPUTES BETWEEN YOU AND 1-800 CONTACTS AND WAIVING ANY RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION. By using, registering with or shopping at 1800contacts.com (the "Website"), you accept these Terms, including this arbitration provision and class action waiver, so please read them carefully[.]
>
> By using this Website, you affirm that you are able and legally competent to agree to and comply with these Terms. If you do not meet these requirements, you must not register for or purchase products from the Website.
>
> If you do not agree to these Terms, then you may not use, register for or purchase products from the Website.

*Id.*, Exhibit A; ECF No. [12-1] at 5. The Terms also contain the following language regarding arbitration and class action waiver:

> PLEASE READ THIS SECTION CAREFULLY BECAUSE IT REQUIRES YOU AND 1-800 CONTACTS TO RESOLVE ALL DISPUTES BETWEEN US THROUGH BINDING INDIVIDUAL ARBITRATION AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF FROM 1-800 CONTACTS.

>   (a) Arbitration Agreement. You and 1-800 Contacts agree that all claims and disputes relating in any way to your use of 1-800 Contacts' Website, or to any products you purchase or purchased through 1-800 Contacts, shall be resolved by binding arbitration on an individual basis, except for disputes which can be resolved in small claims court, any dispute in which either party seeks equitable relief for the alleged unlawful use of copyrights, trademarks, trade names, logos, trade secrets, or patents, or any dispute already pending at the time you first assent to these Terms.
>   [. . .]
>
>   (c) No Class Arbitrations, Class Actions, or Representative Action. YOU AND 1-800 CONTACTS AGREE THAT ALL CLAIMS AND DISPUTES WITHIN THE SCOPE OF THIS ARBITRATION AGREEMENT MUST BE ARBITRATED OR LITIGATED ON AN INDIVIDUAL BASIS AND NOT ON A CLASS BASIS. CLAIMS AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE BROUGHT AS A CLASS OR OTHER TYPE OF REPRESENTATIVE ACTION, WHETHER WITHIN OR OUTSIDE OF ARBITRATION, OR ON BEHALF OF ANY INDIVIDUAL OR OTHER GROUP.

*Id.* at 6. The Terms also contain an "Applicable Law" section, which states that "[b]y visiting this Website, you agree that the laws of the state of Utah, without regard to principles of conflict of laws, will govern these Terms of Service and any dispute of any sort that might arise between us." *Id.* at 14.

In the Motion, Defendant argues that Plaintiff's claims are subject to the mandatory arbitration provision and the class action waiver contained in the Terms governing the use of its Website. Defendant contends that by using the Website, Plaintiff agreed to the applicable Terms. Defendant argues further that arbitration clauses are independently enforceable contractual rights. Plaintiff responds that he was unaware of the Terms and did not view or agree to them through any of his interactions with the Website, and as a result, the arbitration provision and class action waiver are unenforceable.

In determining whether the parties agreed to arbitrate a particular dispute, a court must first consider "any formation challenge to the contract containing the arbitration clause." *Solymar Invs.,*

6

*Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 (11th Cir. 2012). This is because "a party plainly cannot be bound by an arbitration clause to which it does not consent." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 46 (2014) (citing *Granite Rock*, 561 U.S. at 299). It is axiomatic that a binding and enforceable contract requires "mutual assent to certain and definite contractual terms. Without a meeting of the minds on all essential terms, no enforceable contract arises." *Matter of T&B Gen. Contracting, Inc.*, 833 F.2d 1455, 1459 (11th Cir. 1987) (citations omitted). Therefore, the Court must determine whether an agreement exists in this case such that Plaintiff should be bound by the arbitration or class action waiver provisions in the Terms. However, the parties disagree with respect to which state's law applies in making this determination.

**A. Choice of law**

Defendant argues that the Court should apply Utah law due to the Term's choice of law provision, while Plaintiff argues that the Court should apply Florida law. The Court agrees with Plaintiff. Based on Plaintiff's challenge to the very existence of an agreement, applying Utah law would be improper because "applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." *Herman v. Seaworld Parks & Ent., Inc.*, No. 8:14-cv-3028-T-35JSS, 2016 WL 7447555, at *3 n.2 (M.D. Fla. Aug. 26, 2016) (citation omitted); *see also Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ("whether the choice of law provision applies depends on whether the parties agreed to be bound by [the] Terms of Use in the first place.").

Moreover, in determining a state law issue, a federal court applies the choice-of-law rules of the jurisdiction in which it sits. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998). Florida applies the doctrine of *lex loci contractus* to issues involving matters of contract. *Shaps v. Provident Life & Acc. Ins. Co.*, 244 F.3d 876, 881 (11th Cir. 2001)

(citing *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995)); *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1091 (11th Cir. 2004) ("Under Florida's choice-of-law rules, *lex loci contractus* applies in contract matters.") (citation omitted). "*Lex loci contractus* 'provides that the law of the jurisdiction where the contract was executed governs interpretation of the substantive issues regarding the contract.'" *Prime Ins. Syndicate, Inc.*, 363 F.3d at 1092 (quoting *Lumbermens Mut. Cas. Co. v. August*, 530 So. 2d 293, 295 (Fla. 1988)). The record in this case indicates that Fridman, a Florida resident, accessed Defendant's website and made purchases while located in Florida. *See* ECF No. [1-1] ¶¶ 7, 12. Accordingly, the issue of contract formation is governed by Florida law in this case.

### B. Validity of the browsewrap agreement

Florida courts have recognized two main types of internet contracts: (1) clickwrap agreements: "when a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions[;]" and (2) browsewrap agreements: "when a website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process. The purchaser can complete the transaction without visiting the page containing the terms and conditions." *Bell v. Royal Seas Cruises, Inc.*, No. 19-cv-60752, 2020 WL 5742189, at *5 (S.D. Fla. May 13, 2020) (citation omitted), *report and recommendation adopted*, No. 19-cv-60752, 2020 WL 5639947, at *1 (S.D. Fla. Sept. 21, 2020); *see also Nguyen*, 763 F.3d at 1176 ("The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the [terms of the] browsewrap agreement or even knowing that such a webpage exists.") (citation omitted). The Motion, Response, and Reply, including the attachments thereto, reveal no dispute regarding an essential fact: a user of the

Website is not required to affirmatively consent to the Terms before being allowed access to the Website or prior to making a purchase through the Website. Moreover, the parties both refer to the Terms as a browsewrap agreement. Under Florida law, a browsewrap agreement is enforceable "when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *Bell*, 2020 WL 5742189, at *5.

    i.    <u>Actual notice</u>

Defendant does not contend that Plaintiff was on actual notice of the Website's Terms. In addition, Plaintiff states that prior to filing this lawsuit, he never saw the Terms, did not know that they included an arbitration agreement, and he never agreed to the Terms or to arbitrate any dispute with Defendant. *See* Fridman Declaration, ECF No. [23-2]. Defendant has provided no evidence to rebut Plaintiff's assertion that he lacked actual knowledge of the Terms prior to the initiation of this case. Therefore, the Court does not find that Plaintiff was an actual notice of the Terms. The Court must therefore determine whether the hyperlink to the Terms was sufficient to place Plaintiff on constructive notice of the arbitration and class action waiver provisions.

    ii.    <u>Constructive notice</u>

When "there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F3d at 1177. "Whether a reasonably prudent user is put on inquiry notice turns on the clarity and conspicuousness of [the] terms." *Babcock v. Neutron Holdings, Inc.*, 454 F. Supp. 3d 1222, 1230 (S.D. Fla. 2020) (citations and quotations omitted). "In the context of web-based contracts, clarity and conspicuousness are a function of the design and content of the relevant interface." *Id*. (citations and quotations omitted).

Defendant argues that Plaintiff had sufficient constructive notice of the Terms to be bound by the arbitration and class action waiver provisions because he used the Website to place orders for contact lenses, and during each visit, had an opportunity to review the Terms in full. Defendant points specifically to the location of the hyperlink to the Terms, indicating that the initial page of the Website includes a direct hyperlink to the Terms centered at the bottom, which is not cluttered, stands out, and is clear enough for a reasonably prudent person to see. Lujan Declaration, ECF No. [12-1] ¶ 11. Defendant argues that Plaintiff could click on the hyperlink and review the Terms when he set up his account. According to Defendant, Plaintiff also had the opportunity to review the Terms when he purchased contact lenses both when he accessed the initial page of the Website, and on the Order Summary page. *Id*. ¶¶ 11, 13. The Order Summary page also has a link to the Terms at the bottom. *Id*. at 17. In sum, Defendant contends that the Terms are conspicuous enough to place a consumer on inquiry notice because they are located separate from the list of other hyperlinks and are not buried in text or otherwise difficult to locate.

In response, Plaintiff argues that the hyperlink to the Terms was not conspicuous enough to put a reasonably prudent person on inquiry notice specifically because the hyperlink to the Terms is in small font at the bottom of the page, which requires a user to scroll down numerous times before the link becomes visible. Levin Declaration, ECF No. [23-1] ¶ 4.[1] Notably, Plaintiff also points out that a user can complete the entire process of creating an account and purchasing contact lenses without ever scrolling to the bottom of the Website pages where the hyperlink to

---

[1] Defendant takes issue with the Levin Declaration, which demonstrates the account setup and purchase process, contending that Plaintiff has not asserted that the process is illustrative of what Plaintiff did, and that Plaintiff's lawyer's interactions with the Website have no relevance to Plaintiff's experience with the Website or Plaintiff's inquiry notice of the Terms. However, Defendant has not disputed or presented any evidence to rebut the main proposition that the Levin Declaration is provided to support—that a user need not scroll to the bottom of the pages where the hyperlink to the Terms is located in order to interact with the Website or complete a purchase.

the Terms is visible. Plaintiff relies primarily upon *Vitacost.com* and *Herman*. Upon review, the Court finds these cases to be instructive.

In *Vitacost.com*, an internet seller of dietary supplements sought to compel arbitration of a buyer's claims based upon an arbitration provision contained in the "terms and conditions of sale." Similar to the Terms here, the "terms and conditions of sale" were accessible via hyperlink during the online transaction, and which the seller argued were incorporated into the sale as part of a browsewrap agreement. 210 So. 3d at 762. Similar to Defendant's argument here, the seller in *Vitacost.com* contended that the terms and conditions were conspicuous enough to place the buyer on inquiry notice, providing screenshots of the website showing where the hyperlink was located on each page on the website. *Id*. at 762-63. In rejecting the seller's argument, the court noted in particular that the hyperlinks appeared at the bottom of the webpage, requiring a buyer to scroll through multiple pages of products before reaching them and that the website allowed a buyer to complete a sale without seeing the hyperlink. *Id*. at 765.

In *Herman*, the defendant SeaWorld, like Defendant here, argued that because plaintiff used its website to purchase EZpay passes, her breach of contract claim had to proceed in arbitration according to the arbitration provision contained in its website's terms and conditions. 2016 WL 7447555, at *2. Specifically, SeaWorld argued that the location of the hyperlink on the webpage and its proximity to a "Continue" button the plaintiff had to click in order to purchase her passes was sufficient to place her on constructive notice of the website's terms and conditions. *Id*. at *6. In rejecting SeaWorld's contention, the court noted that the hyperlink was in small type and at the very bottom of the website, which would require a user to affirmatively scroll unprompted to the bottom of a page to view it. *Id*. The court noted further that a user of SeaWorld's website could complete a purchase on the website without ever having to bring the hyperlink into

view, and that there was nothing else that would direct a reasonably prudent user to view the website's terms and conditions or otherwise place a user on notice that the use of the website alone would constitute implied acceptance of those terms. *Id.* Those circumstances are nearly identical to the facts in this case.

First, contrary to Defendant's assertions, the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the pages where it is featured. In the screenshots provided by Defendant, the hyperlink is listed at the very bottom in small font, and the same size and color as the other hyperlinks, which include "Privacy practices," "Terms and conditions," "Accessibility," and "Ad Choices," as shown below. *Id.* at 3.



Although located near the "Live chat" button, there is no evidence to indicate that every user would or actually does use the "Live chat" function. Nor is there any indication that Plaintiff specifically used the "Live chat" function, such that he would have had occasion to scroll to the bottom of the initial webpage and possibly view the hyperlink to the Terms. The placement of the Terms

hyperlink at the bottom of the "Order Summary" page is similarly small and unremarkable in comparison to the other hyperlinks featured and would require a user to scroll to the bottom of the page to see it, *see id.* at 17:



Second, Defendant has provided no evidence to rebut Plaintiff's assertion that a user can avail himself of the Website's services, including setting up an account and ordering contact lenses, without ever having to scroll to the bottom of the Website's pages that feature the hyperlink to the Terms. Indeed, Defendant's own screenshot of the Order Summary page illustrates that a user can place an order, and when he reaches the Order Summary page, can view an order confirmation with an estimated delivery date, complete an insurance form for reimbursement, upload a prescription, claim an offer for 25% of glasses, view the detailed order summary, and print an invoice, all without scrolling to the bottom of the page where the hyperlink to the Terms is located. *See id.*

Finally, as Plaintiff points out, the receipt for his order on December 25, 2020 contains no reference to the Terms. *See* ECF No. [23-3]. Here, as in *Vitacost.com*, Plaintiff's use of the Website and ability to make a purchase through the Website never required him to actually view or agree to the Terms because the record reflects that Plaintiff could set up an account and purchase contact lenses without ever having to scroll to the bottom of the webpages where the hyperlink to the Terms is located. *See* 210 So. 3d at 765 (noting that "none of the webpages made the plaintiff's purchase subject to the 'terms and conditions of sale.'"). In addition, similar to *Herman*, in which the court found no constructive notice, the location of the hyperlink alone is insufficient to place a user on notice of the Terms. *See* 2016 WL 7447555, at *6.

Defendant asserts that Plaintiff assented to the Terms by using the Website and relies upon *Brueggemann v. NCOA Select Inc.* is incorrect. No. 08-80606-CIV, 2009 WL 1873651, at *2 (S.D. Fla. June 30, 2009). However, this reliance is misplaced. In *Brueggemann*, the court concluded that the plaintiff's claims were subject to arbitration because prior to entering the website, a user was explicitly told that "[e]ntering this Site will constitute your acceptance of these terms and

conditions. If you do not agree to abide by these terms, please do not enter the Site." *Id*. Here, Defendant has provided no evidence that any such feature of the Website would direct a reasonably prudent user to view Terms or otherwise place a user on notice that the use of the Website alone would constitute acceptance of those Terms. *Herman*, 2016 WL 7447555, at *6.

Furthermore, Defendant's reliance upon this Court's decision in *Arencibia v. AGA Service Company*, --- F. Supp. 3d ----, 2021 WL 1318225, at *6 (S.D. Fla. Apr. 7, 2021), is equally unavailing. In *Arencibia*, the plaintiff purchased trip insurance when booking a roundtrip airline ticket, believing that he would not be responsible for any cancellation fees, and that he would be reimbursed for the price of his flight in the event of a cancellation. *Id*. at *1. The Court determined that even if the plaintiff did not read the insurance policy, he was nevertheless on inquiry notice that "terms, conditions, and exclusions" applied, because the hyperlink to the terms in question was located right below the offer for trip insurance. *Id*. at *6. Here, as the Court has already noted, the placement of the hyperlink to the Terms was not in close proximity to any feature of the website that would have drawn Plaintiff's attention to it, either on the Website's initial page or on the Order Summary page.

As a result, the record does not support the conclusion that Plaintiff was on constructive notice of the Website's Terms, which include the arbitration and class action waiver provisions. As such, the Court finds that there is no valid agreement in this case, which would require that Plaintiff's claims must proceed through arbitration on an individual basis. *See IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.*, 975 F. Supp. 2d 1267, 1282-83 (S.D. Fla. 2013) (finding no mutual assent to the terms of a browsewrap agreement, where the hyperlink to the terms was located at the bottom of each webpage and there was insufficient notice that downloading items from the website would bind users to the agreement). Because the Court concludes that Plaintiff

15

is not bound by the Terms in this case, the Court does not consider Defendant's remaining arguments with respect to the scope of the agreement or Defendant's alternative request to stay the proceedings in this case.

### IV.     CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion, **ECF No. [12]**, is **DENIED**; and
2. Defendant's Motion to Stay Proceedings Pending a Ruling on Defendant's Motion to Compel Arbitration, **ECF No. [16]**, is therefore **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 12, 2021.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record